In re Gussie Mae TAYLOR, Debtor.

SEARS, ROEBUCK AND CO., Plaintiff,

v.

Gussie Mae TAYLOR, Defendant.

G.E. CAPITAL CORPORATION/MACY'S, Plaintiff,

v.

Gussie Mae TAYLOR, Defendant.

MONTGOMERY WARD CREDIT CORPORATION, Plaintiff,

v.

Gussie Mae TAYLOR, Defendant.

FDS NATIONAL BANK, Plaintiff,

v.

Gussie Mae TAYLOR, Defendant.

Bankruptcy No. 96–06051–8C7. Adversary Nos. 96–823, 96– 830 through 96–832.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

July 25, 1997.

Ralph S. Marcadis, Tampa, FL, Chris Vorbeck, Sarasota, FL, for Sears, Roebuck and Co.

Louis Bakkalapulo, Clearwater, FL, for FDS National Bank, G.E. Capital Corporation/Macy's, and Montgomery Ward Credit Corporation.

Michael Barnett, Tampa, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

The court tried these four adversary proceedings jointly on March 25 and 26, 1997. Based upon the stipulated facts, the testimony and the evidence, the court's evaluation of the credibility of the witnesses, the parties' trial briefs (Documents Nos. 32, 35, and 38),[1]

---

1. For convenience, the numbered docket document references used in these findings and conclusions are to the docket document numbers of the lead adversary proceeding, Adversary Proceeding No. 96–823. Generally, the same documents appear in the other adversary proceeding files, although sometimes with different docket numbers.

and the parties' post-trial submissions (Documents Nos. 46 and 47), the court finds the following facts by a preponderance of the evidence and makes the following conclusions of law:

## I.

The defendant, Gussie Mae Taylor, filed a petition for relief under Chapter 7 of the Bankruptcy Code in this court on May 9, 1996. The court granted the defendant a Chapter 7 discharge on August 15, 1996.

Within the time permitted by the rules, four creditors filed adversary proceedings against the defendant seeking to except their debts from the defendant's discharge. The plaintiff, Sears, Roebuck and Co. ("Sears"), filed Adversary Proceeding No. 96–823; the plaintiff, G.E. Capital Corp./Macy's ("GECC"), filed Adversary Proceeding 96–830; the plaintiff, Montgomery Ward Credit Corp. ("Montgomery Ward"), filed Adversary Proceeding No. 96–831; and the plaintiff, FDS National Bank ("FDS"), filed Adversary Proceeding No. 96–832.

The complaints in these adversary proceedings were substantially the same. Each alleged credit card indebtedness owed by the defendant to the plaintiff. Each alleged a claim of non-dischargeability of that indebtedness because of fraud in the use of the credit card within the meaning of Section 523(a)(2)(A) of the Bankruptcy Code. Each also alleged a claim for willful and malicious injury by the defendant to the plaintiff or the property of the plaintiff within the meaning of Section 523(a)(6) of the Bankruptcy Code. These Section 523(a)(6) claims alleged that the defendant disposed of the merchandise purchased with the credit cards in derogation of the plaintiffs' alleged security interests in that merchandise.

Because each of these four adversary proceedings involved common fact and legal issues, the court set them all for pretrial proceedings and trial on the same schedule, ordered a single, joint pretrial stipulation, and conducted a joint trial (Document Nos. 9, 10, and 33).

The issues tried are described more specifically in the parties' pretrial stipulation (Document No. 31) as modified by the court's order on final pretrial conference (Document No. 33).[2] In addition, the court's order granting plaintiffs' motion to strike third affirmative defense (Document No. 40), entered on March 25, 1997, determined that the plaintiffs were legally able to take security interests in merchandise purchased under Florida "revolving accounts" as described in Sections 520.30 *et seq.,* Florida Statutes, if the parties otherwise complied with applicable law as to the creation of such security interests. *Sears, Roebuck & Co. v. Taylor (In re Taylor),* 208 B.R. 720, 722 (Bankr. M.D.Fla.1997).

The court has jurisdiction of the parties and the subject matter pursuant to the provisions of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing, general order of reference entered by the district court. These are core proceedings within the meaning of 28 U.S.C. § 157(b) and adversary proceedings governed by the Federal Rules of Bankruptcy Procedure, including Part VII of those rules.

## II.

These adversary proceedings involve events that generally occurred in the fall of 1995. During this period, the defendant had the following credit card accounts with the plaintiffs: two accounts with Sears; accounts with Rich's and Burdines (represented by the plaintiff, FDS); an account with Montgomery Ward; and an account with Macy's (repre-

---

**2.** The defendant offered no evidence at trial that the plaintiffs failed to comply with federal and state disclosure requirements as to interest and the application of payments. The defendant similarly offered no evidence that the plaintiffs charged interest in excess of that permitted by law. The court is therefore not required to decide if these constitute legal defenses to the plaintiffs' claims.

sented by the plaintiff, GECC).[3]  At all material times, these accounts were open and available to the defendant for use; at no time before the charges in issue did any plaintiff revoke the defendant's card privileges.

In addition to these accounts, the debtor also had accounts with other creditors, including AmSouth Bank, AT & T Universal Card, Amoco VISA, Capital One, Chase VISA, Dillards, Discover Card, Gordon's, J.C. Penney, Prime Option Master Card, Service Merchandise, Society Bank VISA, Belks, and Zales.

The defendant is a middle aged woman with grown children.  In the years before the filing of the bankruptcy case she held two jobs.  She worked full-time as an assistant in the pharmacy at Tampa General Hospital, and she also held a part-time job at a Target retail store.  In 1994 her total income from employment was about $19,000.  Historically, the defendant used her credit card accounts responsibly.  Her credit account history was "clean," and she paid her accounts when they were due.

In December, 1994, the defendant was laid off from her job at Tampa General Hospital and was receiving only $600 per month from her part-time job at Target.  About six weeks later, she began receiving unemployment assistance in the amount of $200 every other week.  This assistance continued during most of 1995.  Although it was a time of financial distress, the defendant was able to pay her monthly obligations as they became due.  She did this by cutting her expenses, and she also received assistance from her mother and her sister.

In June, 1995, the defendant met a man, Bobby Davis, through a personal advertisement in *The Tampa Tribune.*  The defendant and Mr. Davis were married one month later on July 7.  Although Mr. Davis was unemployed and had no income, he told the defendant that he was to begin working in the fall as a professor at the University of Tampa.  He also told her that he was to receive a quarter million dollar inheritance from his deceased adopted father's estate that was being administered in Canada.  Mr. Davis told the defendant that he needed money to "spring" the inheritance from the estate in Canada.  Mr. Davis represented to the defendant that the money was needed to pay back taxes and to pay attorneys.  He also told the defendant that he needed to give gifts to his mother and family to prevent them from challenging the inheritance.

The defendant gave Mr. Davis $1,800 from her savings and obtained an additional $1,000 for Mr. Davis from her son who was serving in the Marines.  She also obtained more funds from her parents and her sister for Mr. Davis.  Mr. Davis was to repay these monies from the inheritance when it was received.  Before any monies were loaned to Mr. Davis, Mr. Davis showed the defendant papers that appeared to substantiate his claim of entitlement to an inheritance.  At one point, Mr. Davis telephoned a Montreal bank, and the defendant listened in on the conversation.  This telephone call further substantiated in the defendant's mind the *bona fides* of Mr. Davis' claim to an inheritance.

When these funds provided by and through the defendant were insufficient, Mr. Davis suggested taking cash advances from her VISA and Master Card accounts.  The defendant took cash advances on these accounts to the full extent of her credit limits and gave the money to Mr. Davis.

When the cash advances were insufficient to obtain the inheritance, Mr. Davis next suggested using the defendant's retail store credit cards to purchase items that would bring the highest return on resale, such as jewelry and electronics.  The defendant and Mr. Davis bought a series of luxury items on credit at the retail stores at which the defendant had accounts.  The defendant and Mr. Davis did this by exhausting the credit line at

---

**3.** The Macy's account was opened the day the purchases in question were made.  The ·debtor made application at the register.

each store before moving on to the next. The last stores and accounts used in this spending spree were the accounts represented by the plaintiffs in these four adversary proceedings.

The items that were purchased using retail store credit were mostly jewelry and electronics. Both the defendant and Mr. Davis were together when they purchased the items, but Mr. Davis, rather than the defendant, selected the items. The defendant, however, signed the charge slips for each item. At the time of the bankruptcy filing, the defendant retained none of the merchandise that was purchased. At the Section 341 meeting of creditors, the defendant testified that Mr. Davis bought many of these items as gifts for his family. At trial, however, it appeared that much of the merchandise had been pawned for cash at pawnshops in Tampa and Jacksonville. Although the defendant signed the pawn tickets involved, Mr. Davis received the pawn money.

When all of the credit accounts were exhausted in this fashion, Mr. Davis disappeared. He vanished just before Thanksgiving, 1995, taking the defendant's automobile. Shortly after Mr. Davis left, the defendant visited the Hillsborough County Sheriff's Office in Brandon to report the theft of her automobile. Deputy Sheriff Michael Eastman was dispatched to her home the same day. The defendant informed Deputy Eastman that her husband had stolen her car and had used her credit cards and run up large bills. Because the parties were married, Deputy Eastman considered the matter to be a civil problem, and Deputy Eastman advised the defendant that he could take no criminal action.

By this time, the total amount of credit card indebtedness incurred by the defendant exceeded $100,000. Included in that amount is $10,009.74 owed to Sears, $3,136.60 owed to GECC on the Macy's account, $4,155 owed to Montgomery Ward, and $13,940.28 owed to FDS on the Rich's and Burdines accounts. Each plaintiff is the owner of the account or accounts described and is a proper party plaintiff with regard to each respective account. The defendant made no payments to the plaintiffs after the merchandise representing the indebtedness was purchased.

The defendant now recognizes that Mr. Davis duped her and that she foolishly allowed him to use her and her credit accounts. The defendant met Mr. Davis in June, they were married in July, the charges in issue occurred in September and October, and Mr. Davis left in early November.

Although the defendant did not have the ability to repay the charges from her income at the time the charges were made, she believed that Mr. Davis would receive the inheritance shortly and that the accounts could and would be repaid from that source. The defendant had the same belief at the time she participated in the pawning of many of the items purchased. The defendant's expectancy with regard to the inheritance was specific and direct. She believed that the inheritance existed and that it would be paid to Mr. Davis promptly.

In many ways, the story of the defendant and the way in which Mr Davis victimized her is a story that is stranger than fiction. Accordingly, the court closely scrutinized the defendant as she testified because her story is one that would be easy to disbelieve. Despite this close scrutiny, the defendant testified candidly and credibly. This trial occurred over the span of two days. The court therefore had ample opportunity to observe the defendant and her demeanor. As a consequence of this experience, the court accepts her testimony as completely credible. In addition, Deputy Eastman's testimony, based upon contemporaneous discussions with the defendant, supports the defendant's story and is inconsistent with the plaintiffs' claim that her story is a recent fabrication.

All of the store credit card accounts involved in these proceedings were pre-existing and pre-dated the spree except one, the Macy's account that was opened at the time of the purchases involved. When the defendant opened the Macy's account, she told Macy's that her income was $3,833 per

month from Tampa General Hospital. At the time, of course, this information was untrue. Macy's opened the account on the spot based upon a credit report obtained from TRW that showed 26 trade lines, ten open accounts, and excellent credit. The defendant the charged up to the credit limit on fine jewelry selected by Mr. Davis.

The defendant consulted no attorney concerning bankruptcy until well after the charges at issue here were made and Mr. Davis left.

### III.

■ Section 523(a)(2)(A) of the Bankruptcy Code excepts from the Chapter 7 discharge debts represented by money or property obtained by the debtor by use of "false pretenses, a false representation, or actual fraud." In *First National Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), our court of appeals dealt with the issue of what constitutes false pretenses and a false representation in the context of a credit card non-dischargeability adversary proceeding. There the court held that a debtor's use of a credit card after the debtor has been informed of its revocation constitutes false pretenses and a false representation sufficient to result in an exception of the debt from the discharge. The court reasoned that a debtor who uses a credit card with knowledge that it has been revoked makes an "affirmative misrepresentation that one is entitled to possess and use the card." *Id.* at 932.

The court, however, went on to hold that, absent extraordinary circumstances not present there, a debtor's use of a credit card before revocation will not constitute false pretences or a false representation because the credit card issuer assumes the risk of such use and factors such losses into its finance charges. *Id.* at 932–33. The facts in *Roddenberry* were that the debtor used her credit card before it was revoked notwithstanding the fact that she knew she could not repay the charges at the time she made them. In those circumstances, the court held, there were no false pretenses or a false

representation within the meaning of this exception to discharge.

In so holding, the court emphasized that the false pretenses and representations exception to discharge is to be construed narrowly in furtherance of the "principle that bankruptcy is designed to provide a fresh start for honest debtors who unexpectedly fall into financial difficulties." *Id.* at 930 (citations omitted). The court also noted that this exception to discharge was not meant to provide improvident creditors with "special protections in bankruptcy for the assumption of common business risks." *Id.* at 932.

Here, no plaintiff revoked the defendant's credit card privileges before or after the charges were made. Under *Roddenberry,* therefore, the court cannot find false pretenses or a false representation merely based on the defendant's plain and admitted inability to pay the charges from her income. Although *Roddenberry* was decided under the old Bankruptcy Act, it nevertheless remains good law under Section 523(a)(2)(A) of the Bankruptcy Code. *See Birmingham Trust National Bank v. Case,* 755 F.2d 1474, 1476 (11th Cir.1985).

■■ The plaintiffs also contend that the defendant committed actual fraud while using her cards. To prevail on a claim of actual fraud, each plaintiff must establish that:

1. The defendant made materially false representations;

2. At the time defendant made them, the defendant knew the representations were false;

3. Defendant made them with the intention of deceiving the other party;

4. The other party relied upon those representations; and

5. The other party sustained damages as the proximate result of those misrepresentations.

*AT&T Universal Card Services v. Stansel (In re Stansel),* 203 B.R. 339, 343 (Bankr.

M.D.Fla.1996). The plaintiff has the burden of proving that the debt is non-dischargeable by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

Because each and every element must be established to support a finding of actual fraud, the plaintiff's failure to establish any one factor is determinative of the outcome. In the context of a non-dischargeability claim in bankruptcy, the third and fourth factors have garnered the most discussion and analysis in the case law.

■ In determining whether the defendant made false representations with the intention of deceiving the plaintiff, the court must consider "all the evidence and assess the debtor's intent on a case by case basis." *Manufacturers Hanover Trust Co. v. Abercrombie (In re Abercrombie),* 148 B.R. 964, 966 (Bankr.M.D.Fla.1992). This assessment may include an objective determination of the debtor's intent using the litany of factors described in cases such as *Household Credit Services v. Rivera (In re Rivera),* 151 B.R. 602, 605 (Bankr.M.D.Fla.1993), and *Manufacturers Hanover Trust Co.,* at 965–66. Ultimately, however, the court must determine the debtor's subjective intent to repay. *See AT&T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724, 733 (Bankr.N.D.Ill.1996).

In this case, the court has specifically found as a matter of fact that the defendant believed at the time she made the charges that she could pay them from the expected inheritance. In this sense, this case is not at all like *Sears, Roebuck & Co. v. Davis (In re Davis),* 134 B.R. 990, 992 (Bankr.M.D.Fla. 1991), where the defendant's expectations of "hit[ting] the big one" in the lottery or "[breaking] the bank" in Las Vegas were clearly unreasonable and therefore were not helpful to the defendant in resisting a claim that the debtor intended to deceive the credit issuer. *Id.*

The defendant here did not intend to deceive the plaintiffs, with Sears, Montgomery Ward, and FDS, when she used her accounts with them. The court concludes, therefore, that these plaintiffs have failed to show actual fraud in connection with the use of the cards because their proof has failed on the necessary third element. For these reasons, the court finds that the indebtedness of the defendant to each of the plaintiffs, Sears, Montgomery Ward, and FDS, is not excepted from her discharge pursuant to the provisions of Section 523(a)(2)(A) of the Bankruptcy Code.

## IV.

■ With regard to the Macy's account, the court concludes that GECC has shown by a preponderance of the evidence that the defendant obtained money or property by use of actual fraud within the meaning of Section 523(a)(2)(A). GECC has shown each of the five elements of fraud as described in the *Stansel* case, 203 B.R. at 339. The defendant opened the Macy's account misrepresenting her income. At the time she had been laid off from Tampa General Hospital, and she had no income other than her part-time Target income and her unemployment assistance. She did not have an income of $3,833 a month from the hospital as she told Macy's.

She made this false representation to obtain the credit, and she knew that she would not be given the credit if she told the truth about her income. Thus, the defendant intended to deceive Macy's notwithstanding the fact that she believed she could repay Macy's from the inheritance. Macy's actually and justifiably relied on her representations of income. Macy's obtained a credit report, and the credit report and the defendant's income statements were consistent. Macy's therefore justifiably granted the credit on the spot. *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995). The defendant has not paid the charges. As a consequence of the defendant's misrepresentations, therefore, GECC has been damaged.

At trial, the defendant did not deny this deceit. She testified in her defense that she

was pressured by Mr. Davis to open the account. She nevertheless knew that she was engaging in deceit in order to comply with his wishes. Her statements to Macy's were voluntary. In these circumstances, she made these false statements of her income knowingly and intentionally.

For these reasons, the court concludes that the indebtedness of the defendant to GECC on the Macy's account, $3,136.60, is excepted from her discharge pursuant to the provisions of Section 523(a)(2)(A) of the Bankruptcy Code.[4]

## V.

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge debts "for willful and malicious injury by the debtor to another entity or the property of another entity." In these proceedings, each plaintiff asserts that the defendant's disposition of its collateral subject to its alleged purchase money security interest constitutes such "willful and malicious injury." The plaintiffs therefore seek to except the debts from discharge.

■ Courts have generally held that a debtor who intentionally disposes of property in which a creditor has a security interest commits such willful and malicious injury within the meaning of Section 523(a)(6). *See, for example, Rentrak Corp. v. Forbes (In re Forbes )*, 186 B.R. 764, 768–69 (Bankr. S.D.Fla.1995). In addition, courts have held that, for an act to be willful, it need only be intentional and done voluntarily. *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1262 (11ᵗʰ Cir.1988). The maliciousness element of Section 523(a)(6) may be satisfied by a showing of implied or constructive malice. *Id.* at 1263–64. Moreover, courts have held that a creditor is not required to prove that a debtor's motive was to harm the creditor or the creditor's interest in property. *Commu-*

*nications Family Credit Union v. Wilson (In re Wilson )*, 126 B.R. 122, 124 (Bankr. M.D.Fla.1991):

> [A]n intentional act which produces harm and is without just cause or excuse may be characterized as "willful and malicious," notwithstanding the fact that there may be no proof that the debtor had a specific intent to injure the creditor.

*Id.* (citation omitted).

In this case, each plaintiff had a valid security interest in the items purchased on the accounts because the sales receipts, signed by the defendant, sufficiently permit identification of the collateral and the receipts clearly state that the purchaser is granting security interests in the purchased property putting defendant on constructive, if not actual, notice of the security interest. *See* § 679.203, *Fla.Stat.* In addition, the account agreements between each plaintiff and the defendant all called for the granting of those security interests in this fashion. The plaintiffs were not required to file financing statements to perfect their security interests because each of the items of collateral was a consumer good and the security interest was a purchase money security interest. § 679.302(1)(d), *Fla.Stat.*

■ Regarding what is excepted from the discharge because of willful and malicious injuries, a claim under Section 523(a)(6), by definition, is limited to the lesser of the amount of the debt or the value of the property in which the plaintiff has a security interest that the defendant has wrongfully destroyed. *Shaver Motors, Inc. v. Mills (In re Mills )*, 111 B.R. 186, 207 (Bankr.N.D.Ind. 1988). This value is as of the time of the conversion. *Avco Financial Services of Alabama, Inc. v. Alexander (In re Alexander )*, 201 B.R. 294, 298 (Bankr.N.D.Ala.1996).

■ These principles necessarily apply because the gist of Section 523(a)(6) is to

---

4. In *Birmingham Trust National Bank,* 755 F.2d at 1477, the court of appeals concluded that, in a false pretenses and representation non-dischargeability proceeding, the damages—meaning the amounts to be excepted from the discharge—

are the entire debt rather than the value of the collateral. Although the court relied in part on statutory wording eliminated by the 1984 amendments to the Bankruptcy Code, the case is nevertheless still persuasive.

make non-dischargeable willful injuries. When the injury is the destruction of a security interest in collateral by wrongful disposition of the collateral and when the debt exceeds the value of that collateral, the wrong can only be measured by the value of the collateral and not by the amount of the debt itself. When a debtor wrongfully disposes of a creditor's collateral that is worth less than the amount of the debt, it is not the amount of the debt that the creditor loses; it is only the value of the collateral subject to the security interest that the creditor loses. It is this amount that is therefore non-dischargeable. Thus, evidence of value of the collateral at the time of conversion is crucial to a plaintiff's case to determine the extent of the plaintiff's injury.[5]

■ In these proceedings, the items of merchandise purchased were ordinary consumer goods. The evidence received at trial includes the sales slips for each of the purchases made by the defendant on the accounts with the plaintiffs. The original, retail sales price for each item of merchandise purchased is therefore in the trial record. Although they were luxury items, they were all items that depreciate in value after purchase at retail. Because the items depreciate in value, the retail sales price of the items is clearly insufficient evidence of the value of the items at the time they were converted, even if that is shortly after the time the items were purchased.

The defendant pawned some of the purchased items. The amount received by pawning might be evidence upon which the court could rely in finding the fair market value at the time of conversion. In this case, however, the pawn tickets that were received in evidence at trial fail to establish the value of the items because the descriptions on the pawn tickets are insufficient to link any pawn ticket to any particular item purchased. The descriptions on the pawn tickets are entirely too general and vague to allow one to match the items. For this reason the court rejects the pawn tickets as evidence of fair market value.

Two expert valuation witnesses testified on behalf of the plaintiffs at trial. The court disregarded the testimony of Beverly Hearne as based upon insufficient factual predicates. The court also struck the testimony of Ronald Fred Ingram as it related to GECC and FDS because the plaintiffs failed to link his testimony of value to the actual items purchased by the defendant. The court accepted Mr. Ingram's testimony relating to items purchased at Sears and Montgomery Ward because the plaintiffs developed a link between the actual items purchased and the valuation testimony.[6]

On this record, therefore, the only items of collateral as to which there is evidence of fair market value at the time of conversion is as follows:

Sears Collateral

| | | |
|---|---|---|
| a. | .50 carat round diamond engagement ring with yellow gold band | $ 600.00 |
| b. | Second ring identical to a. above | 600.00 |
| | | $1,200.00 |

GECC Collateral

| | |
|---|---|
| None | $ 0 |

Montgomery Ward Collateral

| | | |
|---|---|---|
| a. | 2 14 kt yellow gold 3mm × 24" diamond cut rope neck chains | $ 250.00 |
| b. | 14 kt yellow gold ring with channel settings containing 1.43 carat total weight full-cut diamonds | 1,100.00 |
| c. | 18" 14 carat yellow gold 2mm × 18" diamond cut rope neck chain | 40.00 |
| | | $1,390.00 |

FDS Collateral
Rich's Account

| | |
|---|---|
| None | $ 0 |

Burdine's Account

| | |
|---|---|
| None | $ 0 |

5. "The fair market value of the collateral at the time of conversion" was in fact identified in the pretrial stipulation as an issue for trial in these proceedings. (Document No. 31 at ¶ G at 9).

6. In post-trial submissions requested by the court, the plaintiffs and defendant agreed on the personal property values as linked to the expert testimony. (Documents Nos. 46 and 47). Accordingly, the court adopts those values, except as based upon testimony stricken or disregarded at trial.

Notably, each plaintiff bears the burden of persuasion by a preponderance of the evidence as to the value of the collateral subject to its security interest as of the time of its wrongful disposal. *Grogan,* at 291, 111 S.Ct. at 661. Although the record contains evidence identifying most of the merchandise purchased, the record does not contain evidence of fair market value beyond that of the few items listed above. In these proceedings, therefore, the plaintiffs have met their burdens only to the limited extent identified here. *First State Bank of Alsip v. Iaquinta (In re Iaquinta),* 98 B.R. 919, 925–26 (Bankr. N.D.Ill.1989).

■ The defendant's conduct in this case did not prevent or preclude the plaintiffs from meeting their burdens on this point. If a creditor is unable to offer evidence of value because the creditor needs to examine the item to offer such evidence and the defendant's disposition of that item makes the examination impossible, the creditor's lack of precise proof could be excused. *See Dominion National Bank of Richmond v. Gantt (In re Gantt),* 56 B.R. 852, 858–59 (Bankr. E.D.Va.1985). That is not the case here, however, where the items are clearly identified and, by their nature, could easily be valued without physical examination or observation.

In this case the court has found that the debtor intentionally disposed of the collateral subject to the security interests of the plaintiffs. The applicable law makes that disposition willful and malicious notwithstanding the fact that the debtor had no specific intent to harm the plaintiffs when disposing of the collateral.[7] Accordingly, the fair market value of the collateral must be excepted from the discharge of the defendant pursuant to the provisions of Section 523(a)(6) of the

---

**7.** Contrary to the position of the defendant, there are no facts in this case that would work an estoppel against the plaintiffs because they ad-

Bankruptcy Code. The amounts as to each plaintiff are as follows:

| Sears | $1,200.00 |
|---|---|
| GECC | $ 0 |
| Montgomery Ward | $1,390.00 |
| FDS | $ 0 |

Otherwise, the debts owed to the plaintiffs are not excepted by Section 523(a)(6) from the discharge.

## VI.

Pursuant to the provisions of F.R.B.P. 9021, the court is contemporaneously entering a separate judgment in each adversary proceeding consistent with this decision. Pursuant to the provisions of F.R.B.P. 7054(b), the court will not allow costs to the plaintiff's finding that the equities of the proceeding do not justify such an allowance.

vertised goods for sale on credit or as gifts or because the goods were purchased for Mr. Davis.