In re Dean Cordell BRYANT,
et ux., Debtors.

Regina Taylor Clark, Plaintiff,

v.

Dean Cordell Bryant, et
ux., Defendants.

Bankruptcy No. 96–11345–8C7.
Adversary No. 96–1041.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Dec. 2, 1999.

Steven M. Berman, Tampa, Florida, Clifford H. Hardwick, Roswell, Georgia, for plaintiff.

Dennis J. LeVine, Tampa, Florida, for defendants.

*MEMORANDUM OF DECISION*

C. TIMOTHY CORCORAN, III, Bankruptcy Judge.

This adversary proceeding involves the plaintiff's request that the court determine that her claim against the debtor/defendants for fraud in the purchase and sale of a home is excepted from the debtor/defendants' Chapter 7 discharge. The claim involves alleged undisclosed defects in the home that the debtor/defendants sold to the plaintiff. The court is not asked to determine the merits of this state law fraud claim, only that the claim is excepted from the discharge so the plaintiff can liquidate the claim in state court. For the reasons set forth below, the court determines that the plaintiff's proof fails to meet the requirements of Section 523(a)(2)(A) of the Bankruptcy Code and that her claim has been discharged.

I.

The proceeding came on for trial on July 27 and 28, 1999, pursuant to the court's order on final pretrial conference (Document No. 37) and the parties' pretrial stipulation (Document No. 34).

At the conclusion of the trial, the court entertained counsel's closing arguments and requested that counsel submit proposed findings of fact and conclusions of law, responses, and post-trial briefs, if they wished. The parties submitted these documents (Documents Nos. 49, 51, 52, 54, and 55). The parties had also submitted trial briefs before the trial (Documents Nos. 38, 39, 40, and 41). The court has relied heavily on counsel's submissions as drafts in preparing these findings and conclusions.

Based upon the parties' pretrial stipulation and the order on final pretrial conference, the testimony and evidence, the court's determinations as to the credibility of the witnesses, the legal authorities cited by the parties, and counsel's oral and written arguments, the court makes these find-

ings of fact and conclusions of law pursuant to the provisions of F.R.B.P. 7052.

## II.

1. The defendants, Dean Cordell Bryant and Rebecca Ann Harmon Bryant ("defendants" or "Bryants"), filed their Chapter 7 petition on August 28, 1996. The court granted the defendants a Chapter 7 discharge on December 2, 1996.

2. The plaintiff, Regina Taylor Clark ("plaintiff" or "Clark"), filed this adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A) to determine the dischargeability of a debt related to the plaintiff's purchase from the defendants of a house located in Cherokee County, Georgia.

3. The plaintiff alleges that the defendants fraudulently failed to disclose significant latent defects in the home. The plaintiff alleges she was unaware of, or could not have discovered, such defects without disclosure by the defendants. The plaintiff also alleges that the defendants gave her a "Seller's Disclosure Statement" in conjunction with the purchase of the house that the defendants knew to be materially false. The plaintiff alleges that she relied on this statement to her detriment.

4. The defendants deny the plaintiff's allegations.

5. The Bryants purchased the house on River Overlook Road, Cherokee County, Georgia, in 1979. The home was newly constructed and was the first home the Bryants had ever purchased.

6. The Bryants financed the house through a FHA loan. The house was inspected by the FHA and passed inspection. The FHA inspection took a couple of hours. Cherokee County issued a certificate of occupancy. As far as the defendants understood, their newly constructed house complied with all applicable building codes.

7. The house had a bare basement when the Bryants purchased it.

8. In 1982 or 1983, the Bryants hired a contractor, Ralph Reed, to finish the basement.

9. Mr. Bryant understood that Mr. Reed was a licensed contractor and did remodeling work exclusively on residential homes.

10. Mr. Reed put up stud walls in 80 percent of the basement and did the electrical work.

11. Mr. Reed's work subsequently became too expensive for the Bryants, so they looked elsewhere for help to finish the basement.

12. The Bryants then hired William Jones, a local carpenter, to complete the work in the basement. Mr. Jones held himself out to be knowledgeable about residential building construction. Mr. Jones and Mr. Bryant worked together to complete the work. Mr. Jones served as the "supervisor" or "foreman." Mr. Bryant performed much of the labor.

13. Part of the build out included adding a bathroom in the basement. The bathroom consisted of a shower, toilet, and sink. With Mr. Jones, Mr. Bryant performed work to complete this bathroom.

14. Mr. Jones and Mr. Bryant completed the build out in about 1983.

15. During this time, Mr. Jones and Mr. Bryant had no discussions about building code requirements. Mr. Bryant did not know whether Mr. Jones obtained any permits for the improvements in the basement or whether he was even required to obtain any permits. Mr. Bryant did not obtain any permits.

16. The defendants' son, Darren Bryant, lived in the basement in the house from about 1983, when the build out was completed, through August 1994, when the house was sold to the plaintiff.

17. The Bryants listed their home for sale at least twice prior to August 1994, but it did not sell.

18. By the summer of 1994, the Bryants knew that their home had a number of substantial defects or problems that would affect its value and habitability. The Bryants knew their home had the following defects or problems:

a. The roof leaked water that then ran down interior walls and ceilings, especially near the stairs.

b. The basement was damp and prone to leaking, flooding, mold, and mildew.

c. The plumbing in the basement bathroom was improperly installed and vented. Sewer gas odors permeated the bathroom area.

d. The wood in the deck behind the house was rotting.

e. The walls contained some structural cracks.

19. In the summer of 1994, the Bryants decided to move out of Georgia to pursue other employment opportunities.

20. The Bryants therefore listed their home for sale with Sheri Caldwell, a licensed broker with Remax of Atlanta.

21. Ms. Caldwell advised the Bryants that their home would be more marketable if they painted the basement living room a neutral color. At that time, the basement living room of the home was painted pink.

22. Mr. Bryant and his wife also read various articles on making their home more marketable.

23. In conjunction with listing the home for sale with Ms. Caldwell, the Bryants filled out a "Seller's Disclosure Statement" at the request of Ms. Caldwell. The Bryants filled out this form for use in inducing buyers to buy and with the expectation that potential buyers would rely on it. As they completed it, the statement contained numerous misstatements concerning the condition of the home. For example, the Bryant's answered "no" or "not" in response to questions about the house as follows:

\* \* \* \* \* \*

6. ROOF:

(a) Age: 15 years. Has the roof ever leaked during your ownership?

(b) Has the roof been replaced or repaired during your ownership?

(c) Do you know of any problems with the roof or rain gutters?

7. TERMITES, DRYROT, PESTS:

(a) Do you have any knowledge of termites, dryrot, or pests on or affecting the property?

(b) Do you have any knowledge of any damage to the property caused by termites, dryrot, or pests?

\* \* \* \* \* \*

8. STRUCTURAL ITEMS:

\* \* \* \* \* \*

(b) Are you aware of any past or present cracks or flaws in the walls or foundations?

(c) Are you aware of any past or present water leakage in the house?

\* \* \* \* \* \*

(e) Have there been any repairs or other attempts to control the cause or effect of any problem described above?

(f) Has there ever been a fire, flood or wind which required any repair, cosmetic or structural?

\* \* \* \* \* \*

9. BASEMENTS AND CRAWL SPACES:

\* \* \* \* \* \*

(b) Has there even been any water leakage, accumulation, or dampness within the basement or crawlspace?

(c) Have there been any repairs or other attempts to control any water or dampness problem in the basement or crawlspace?

\* \* \* \* \* \*

12. PLUMBING RELATED ITEMS:

\* \* \* \* \* \*

(g) Do you know of any leaks, backups, or other problems relating to any of the plumbing, water and/or sewage-related items?

The Bryants knew these disclosures were false.

24. The Bryants also answered "no" to the question in the Disclosure Statement as follows:

\* \* \* \* \* \*

10. ADDITIONS AND ALTERATIONS:

\* \* \* \* \* \*

(b) Did you obtain all necessary permits and approvals?

(c) Was all work done in compliance with building codes?

The Bryants had no reasonable basis to answer these questions negatively as they referred to the buildout of the basement.

25. Perhaps because of their failures to sell the house when it was on the market before, the Bryants went about hiding the defects that they knew existed in the house. They painted over water stains and cracks in walls. They put deodorizers in all the electric sockets in the basement. They turned over rotten planks in the deck behind the house. This effort went far beyond merely making the home show better for prospective buyers. The Bryants instead affirmatively attempted to hide the defects.

26. On July 29, 1994, approximately two weeks after the home was listed, a potential buyer, Regina Clark, saw a "For Sale" sign at the Bryant's home, knocked on the door of the house unannounced, and asked to view the home.

27. Ms. Clark was employed as an ophthalmic technician and is intelligent and articulate.

28. Ms. Clark recently had divorced and had been granted custody of a young son. Her final judgment of divorce re-

quired her to vacate her former home in a short time. Accordingly, Ms. Clark was looking for alternative housing.

29. In early July 1994, Ms. Clark retained a realtor, Denise McDonald, to help her find a home.

30. While Ms. Clark had lived in several homes, she never had purchased a home by herself. She had left those kinds of matters to her former husband.

31. During her first visit to the house, Ms. Clark received a brief 20 to 30 minute tour of the house from Ms. Bryant.

32. On Ms. Clark's first visit to the house, Mrs. Bryant asked Ms. Clark not to go up in the attic. Ms. Clark never again asked to inspect the attic. She admitted that she was not prohibited at any other time from inspecting any other portion of the home, including the attic.[1]

33. Ms. Clark came back to the house the next day with her realtor to look at the house again.

34. On July 30, 1994, only one day after first seeing the house, Ms. Clark made an offer to purchase.

35. On August 2, 1994, Ms. Clark executed a contract for the purchase of the home. Ms. Clark signed the contract before obtaining or receiving a copy of the Seller's Disclosure Statement.

36. On August 3, 1996, Ms. Clark executed a second revised contract to purchase the property (sometimes "second offer").

37. By the time she made the second offer, Ms. Clark had received the Seller's Disclosure Statement. Although the contract reflects the time "6:00 p.m." as the time of the signing of the offer by Ms. Clark and the time "8:00 p.m." as the time of the receipt of the disclosure, the evidence reflects that one of those times was incorrectly noted on the contract form. The evidence plainly establishes that Ms.

---

1. On the day of closing, Ms. Clark's own real estate agent—and not the Bryants—advised Ms. Clark not to inspect the attic because there was not enough time.

Clark had the disclosure when she made the second offer.

38. Ms. Clark never signed the Seller's Disclosure Statement acknowledging she received it, although the evidence shows she in fact received the disclosure by the time she made the second offer.

39. Ms. Clark acknowledged that the defendants did not tell her anything verbally that induced her to make the offer to purchase the house.

40. Pertinent provisions of the contract were as follows:

Paragraph 6: Inspection.

Buyer, his inspectors or representatives, at Buyer's expense and at reasonable times during normal business hours shall have the right and responsibility to enter upon the Property for the purpose of making a diligent, prudent and competent inspection (including conducting the final walk through)....

Paragraph 6.A. Inspection Procedure.

1. Buyer shall, within *Eight (8)* calendar days from Binding Agreement Date, make such inspection AND either: (a) accept Property in its present condition by written notice to Seller, OR, (b) furnish to Seller a copy of the Inspection Report with a Written Amendment to this Agreement setting forth those items in the inspection report which Buyer requests be repaired and/or replaced and which do not constitute substantial upgrade to the Property. If Buyer does neither (a) nor (b) within the time period set forth in 6.A., then this paragraph 6.A.1. shall be deemed waived by Buyer.

Paragraph 6.B. Property Sold "As Is".

All parties acknowledge and agree that the Property is being sold "AS IS" (except as provided in Condition of Property and Wood Infestation Report paragraphs), with any and all faults. The Seller shall have no obligation for repairs or replacements noted in any inspection(s) made by or for Buyer. Such repairs or replacements shall be the sole responsibility of Buyer.

Paragraph 15(E): Entire Agreement.

This Agreement constitutes the sole and entire agreement between the parties hereto and no modification of this Agreement shall be binding unless signed by all parties to this Agreement. No representation, promise, or inducement not included in this Agreement shall be binding upon any party hereto.

41. As part of the sales contract, the Bryants were to perform additional painting. This requirement was placed in the contract at Ms. Clark's request. The Bryants agreed to this request.

42. The addendum to the contract shows that Ms. Clark declined a one-year home warranty on the property in lieu of the Bryants paying certain closing costs. Ms. Clark declined this home warranty because she wanted to reduce her closing costs.

43. Ms. Clark's contract proposal set the closing for August 15, 1994, less than two weeks after the contract was executed. Ms. Clark advised the Bryants that she needed to close as soon as possible because her divorce decree required her to leave her former home in a short period of time.

44. Ms. Clark failed to obtain a professional inspector to inspect the house as contemplated by Paragraph 6 of the sales contract. Instead, Ms. Clark had her elderly father inspect the house for her.

45. Accompanied by Mr. Bryant, Ms. Clark and her father thoroughly inspected the house a few days after signing the contract. They inspected the house before it was completely painted. The initial inspection performed by Ms. Clark and her father lasted approximately one to two hours. Ms. Clark's father took notes.

46. During this inspection, Mr. Bryant advised Ms. Clark and her father of the various improvements made to the home, including the remodeling of the basement

and the installation of the deck in the back yard.

47. The parties never discussed compliance with applicable building codes. Neither Ms. Clark nor her father ever asked to review any building permits.

48. Ms. Clark and her father were given full access to the house during the inspection. They were not prohibited from looking at any portion of the house during the inspection.

49. Ms. Clark visited the house on several other occasions prior to the closing.

50. While Ms. Clark complained at trial that there were numerous boxes in the house during her initial visits and that these boxes obstructed her view of the house and her ability to inspect it, she never asked the defendants to move any of the boxes.

51. On the day of closing, Ms. Clark spent about two hours inspecting the house, again with her realtor and father.

52. The Bryants had moved everything out of the house by that date, and the house was completely empty.

53. Ms. Clark testified that she felt rushed by her realtor, not by the defendants, on the final "walk through" on the day of closing.

54. Ms. Clark never complained to the defendants or raised any issues about the condition of the house before or at closing.

55. Ms. Clark purchased the home based upon the representations made by her own broker that the home was a "good buy" and because she wanted to live in that particular neighborhood. Ms. Clark also relied on her father's inspection and evaluation of the house, as well as the Seller's Disclosure Statement she received from the Bryants.

56. Ms. Clark could not recall whether she reviewed the Seller's Disclosure Statement prior to executing the first contract for the sale of the home. She had the statement, however, by the time she executed the second offer that led to the making of a binding contract.

57. Ms. Clark testified that she did not understand or pay attention to the terms of the contract regarding inspections, but that she did understand and pay attention to the Seller's Disclosure Statement. This testimony is not credible.

58. Ms. Clark never spoke to or consulted with anybody in the neighborhood about problems that other homeowners may have experienced with similarly constructed homes.

59. Ms. Clark never consulted with any authorities of Cherokee County to determine whether the home complied with all applicable building codes.

60. Soon after taking possession of the house, Ms. Clark found (or was told of) the following problems in the home:

a. Additions and changes to the original structure of the house did not comply with applicable building codes. Specifically, Ms. Clark testified that the improvements to the bathroom in the basement did not comply with applicable building codes.

b. She found severe problems with sanitation and plumbing. Specifically, Ms. Clark testified that the septic tank was overflowing, backed up, and had not been properly serviced. Ms. Clark also testified that the basement bathroom toilet did not flush properly and foul odors were coming from the basement bathroom. Ms. Clark believed that the Bryants strategically placed air fresheners in the basement bathroom to mask the smell.

c. Ms. Clark believed that rotten wood on the outside deck had been purposely concealed by the Bryants by turning the decking over and reinstalling it with the rotten side down.

d. Ms. Clark testified that there was significant water damage in the home that caused warping, ceiling damage, and wood rot. Ms. Clark believed that the Bryants purposely painted over the water damage in an attempt to conceal this from her.

e. Ms. Clark testified that there was inadequate and non-complying plumbing in the laundry. Specifically, Ms. Clark testified that the plumbing in the laundry contained pipes that were too small to allow the washing machine to drain properly.

f. Ms. Clark testified that there was significant water damage and rot in the ceiling. Ms. Clark believed that the Bryants knew of these defects and purposely concealed these defects from her.

g. Ms. Clark testified that the basement was prone to flooding. Ms. Clark believed that the Bryants knew that the basement was prone to flooding and purposely concealed this from her.

h. Ms. Clark testified that the basement has significant moisture problems. Ms. Clark believed that the Bryants knew that the basement was prone to flooding and purposely concealed this from her.

i. Ms. Clark testified that the attic contained knotholes that were covered up and concealed by pieces of wood.

61. The court agrees with Ms. Clark that all of these problems existed at the time of sale, that the Bryants knew of them, and that they took affirmative action to conceal these defects from Ms. Clark.

62. Despite the flooding and dampness problems in the basement, and the alleged plumbing problems in the basement, Ms. Clark has allowed her son to live in the basement since she purchased the home in August, 1994, just as the Bryant's son lived there before the sale.

63. Carl Jones, the expert retained by Ms. Clark, testified by deposition. Carl Jones inspected the home in June 1996, almost two years after the sale had taken place.

64. Carl Jones' inspection of the attic revealed that the attic had improper sheathing in the exterior walls, which did not comply with applicable building codes. The sheathing problems were obvious, and any inspector would have seen them immediately and determined that the lack of sheathing did not comply with applicable building codes. Carl Jones testified, however, that it was reasonable for a homeowner, such as the Bryants, to trust the builder of the home to comply with all applicable building codes.

65. The attic contained obvious water stains that were readily observable to the naked eye. Carl Jones did not know how long the water stains in the attic had been there or when the attic first initially had problems with water damage. It is clear from the evidence, however, that these problems existed at the time of sale.

66. Carl Jones found obvious water stains on the vaulted ceilings near the chimney, which again were readily observable. Carl Jones did not know how long the water stains near the chimney had been there or when the home initially had water damage. It is clear from the evidence, however, that these problems existed at the time of sale.

67. The basement bathroom exhibited a strange smell, which Mr. Jones attributed to improper venting of the fixtures in the bathroom. Carl Jones testified that these ventilation problems were obvious.

68. Carl Jones testified that the plumbing for the washing machine was inadequate, as the pipe was too small. Carl Jones had no knowledge as to when the plumbing or pipes were installed or who installed the plumbing. In fact, the plumbing had been part of Mr. Bryant's "do-it-yourself" basement completion project.

69. Carl Jones found rotten wood turned over on the deck outside of the home. Carl Jones had no knowledge when the wood had been turned over or how long it had been rotten. It is clear from the evidence, however, that these problems existed at the time of sale.

70. With respect to the improvements in the basement, Carl Jones never checked with Cherokee County to see if any permits had been pulled for these improvements.

71. Carl Jones testified that the patches on the knotholes were readily observable.

72. Carl Jones testified that he would not let one of his customers, or even his own daughter, purchase a 15–year–old house without having it professionally inspected prior to closing.

73. Mr. Bryant testified that he believed the Seller's Disclosure Statement that he and his wife executed on July 29, 1994, was complete and truthful to the best of their knowledge. The evidence does not support this testimony.

74. Mr. Bryant testified that in the 15 years he owned his house, he could not recall any significant problems in the basement bathroom, such as problems with backups in the toilet or shower, or any foul odor. The evidence does not support this testimony.

75. Darren Bryant, the defendant's son, lived in the basement of the house from approximately 1984 to 1994, when the house was sold.

76. Darren Bryant used the basement bathroom daily, including the shower and toilet, as his own personal bathroom.

77. Darren Bryant testified that there was no flooding problem, mildew problem, severe odor, or other problems in the basement while he lived there. The evidence does not support this testimony.

78. Mr. Bryant testified generally and in specific terms that he did not attempt to hide defects and that there were no defects. This testimony is not supported by the evidence, nor did he give the testimony credibly. Mr. Bryant was hostile, defensive, and evasive.

79. Significantly, Ms. Bryant was the defendant who dealt most with Ms. Clark and her realtor. She did not testify at trial. Mr. Bryant's explanation for Ms. Bryant's absence was incredible. The court therefore draws an adverse inference from her failure to testify.

80. Each and every one of the problems that the Bryants attempted to hide and that were misstated in the Seller's Disclosure Statement was readily observable by a home inspector. As Carl Jones testified, he could easily identify each one. Had Ms. Clark engaged a home inspector before she closed the purchase, each and every one of the defects that the Bryants attempted to hide and which were misstated on the Seller's Disclosure statement would have been discovered.

### III.

The Court has jurisdiction of the parties and the subject matter pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and the standing order of reference entered by the district court. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

### IV.

The plaintiff seeks to deny the discharge of a debt allegedly owed by the defendants based on Section 523(a)(2)(A) of the Bankruptcy Code. The plaintiff alleges that the debtors made fraudulent misrepresentations regarding the condition of their home sold to the plaintiff in August 1994. To prevail on such a Section 523(a)(2)(A) claim, the plaintiff generally must prove the following elements:

1. The debtor made a materially false representation.

2. The debtor knew the misrepresentation was false.

3. The debtor made the representation with the intention of deceiving the other party.

4. The other party justifiably relied on the statements.[2]

*Distribution Centers, Inc. v. Cato (In re Cato),* 218 B.R. 987, 991 (Bankr.M.D.Fla.1998).

---

2. The standard of reliance to be applied in Section 523(a)(2) actions is justifiable reliance, not reasonable reliance. *Mid America*

5. The other party suffered damages as a result of the statements.

*G.E. Capital Corp. v. Taylor (In re Taylor)*, 211 B.R. 1006, 1013 (Bankr.M.D.Fla. 1997).

■ As our court of appeals has made clear, these elements mirror the common law tort of fraud. *St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 676 (11th Cir.1993).

■ The burden is on the plaintiff to establish each and every one of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Mid America Distribution Centers, Inc. v. Cato (In re Cato)*, 218 B.R. 987, 990 (Bankr. M.D.Fla.1998). Because the plaintiff must establish each and *every element to support* a finding of actual fraud, the plaintiff's failure to establish any one factor is determinative of the outcome. *Taylor*, 211 B.R. at 1013.

■ Federal courts may be helped in interpreting Section 523(a)(2)(A) by looking to traditional state fraud law because Section 523(a)(2)(A) generally mirrors state common law fraud law. *See generally, St. Laurent*, at 991 F.2d at 676. In this case, the sale of the home occurred in Cherokee County, Georgia. In addition, paragraph 15(F) of the contract states that the parties agree it must be "interpreted under and governed and enforced according to the laws of the State of Georgia". In determining this case, therefore, the court will look to Georgia fraud cases arising in the specific context of the failure to disclose defects when selling a home.

The pretrial stipulation and the testimony clearly show that the plaintiff has not alleged that the defendants made any oral representations that she alleges were fraudulent. Instead, the plaintiff claims that (1) the defendants intentionally failed to disclose latent defects of which they had knowledge regarding the house and (2) the defendants intentionally made fraudulent statements in the Seller's Disclosure Statement.

■ As the cases cited below demonstrate, in fraud cases involving failure to disclose latent defects in a home, Georgia courts apply the traditional fraud elements with specific reference to whether (1) latent defects actually existed prior to the sale, (2) the defendants knew about those latent defects, and (3) the defendants, with intent to defraud, intentionally failed to disclose these latent defects to the plaintiff. If the plaintiff can establish these elements, Georgia courts also require the plaintiff to prove that the defects were not ascertainable upon a reasonable inspection of the premises. In other words, the plaintiff must prove that there would be no way for her to have discovered these alleged defects without the defendants telling her about them. In addition, the plaintiff must prove that any alleged defects were material.

With regard to the plaintiff's claim of failure to disclose latent defects, the facts of this case demonstrate that:

1. The defects existed prior to the sale.

2. The Bryants knew about these defects.

3. The Bryants intentionally failed to disclose the defects with intent to defraud.

4. The defects were significant and material.

With regard to the plaintiff's claim of fraudulent misrepresentations contained in the Seller's Disclosure Statement, the facts of this case demonstrate that:

1. The Bryants made materially false representations.

2. The Bryants knew these representations were false.

3. The Bryants made the representations with the intention of deceiving Ms. Clark.

In both cases, the evidence is also clear that Ms. Clark has suffered damages as a

consequence of the Bryants' failure to disclose and misrepresentations.

Thus, the decision in this case turns on the question of justifiable reliance. Was Ms. Clark's reliance on the Bryants' failure to disclose the defects and her reliance on their misrepresentations in the Seller's Disclosure Statement justifiable in the circumstances?

■ The courts in Georgia have rendered several recent decisions that place a heavy burden on a buyer of residential real estate to conduct a thorough investigation prior to purchasing a home. The essence of these cases is that a buyer cannot simply "bury her head in the sand" and ignore problems that an inspection would uncover. In *Fowler v. Overby*, 223 Ga.App. 803, 478 S.E.2d 919, 921 (1996), a purchaser alleged that a seller made material false representations when he told the purchaser that the property had never been used as a land fill or as a dump to receive garbage. The court held for the seller and stated:

> The law in Georgia is well-settled that in the purchase and sale of real estate there is an underlying principle of law ... that one cannot be permitted to claim that he has been deceived by false representations about which he could have learned the truth of the matter and could have avoided damage....

*Id., quoting Hanlon v. Thornton*, 218 Ga. App. 500, 462 S.E.2d 154, 156–57 (1995).

■ The *Fowler* case also teaches that, to show justifiable reliance, the purchaser must show he exercised due diligence. *Id.* Specifically, the court found that, by only visually inspecting the property prior to closing, the purchaser failed to exercise due diligence. The court also found no evidence that the purchaser was prevented from inspecting the property prior to closing. Further, the court found that the purchaser could have learned that the property had been used as a dump to receive garbage if she had used even the

slightest degree of diligence. *Id.* The court therefore concluded that:

> [I]n the sale of land, the purchaser contracts with [her] eyes open; and if [she] is not in some way deprived of the opportunity of inspecting the land for [herself] by the fraudulent acts or conduct of the vendor, [she] will not be heard to complain.

*Id., quoting Hays v. McGinness*, 208 Ga. 547, 67 S.E.2d 720, 721 (1951).

Other Georgia cases on fraudulent misrepresentation in the context of a sale of residential real property support the *Fowler* view. In *Delk v. Tom Peterson Realtors, Inc.*, 220 Ga.App. 576, 469 S.E.2d 741, 742 (1996), the purchaser filed an action against the seller and other parties alleging fraudulent misrepresentation in the sale of a home. The court held for the seller. The court found that the purchaser did not exercise due diligence to discover water leak damage and sags in the roof and thus did not justifiably rely on alleged misrepresentations by the real estate agent. *Id.* The court found that the purchasers had observed water damage and asked about it while viewing the house. The court also noted that any sag in the roof was readily observable. The court stated that:

> [P]laintiffs did not exercise due diligence since they did not conduct any inspection of the premises despite having encountered some of the readily apparent defects while viewing the home.

*Id.* at 742.

Similarly, in *Smith v. Stanley*, 223 Ga. App. 334, 477 S.E.2d 618, 620 (1996), the purchaser of a home brought suit for fraud for the sellers' alleged failure to disclose that the house was susceptible to interior flooding. The court held for the seller and found that the purchasers failed to establish any justifiable reliance on the representations, or lack thereof, regarding interior flooding. *Id.* The court stated that:

> It is only when the defects in the property are of a nature that the buyer could

not discover them through the exercise of due diligence that any burden is placed on the seller to disclose the seriousness of the problems of which he is aware, provided the seller *knows* that the buyer is acting under a misapprehension as to the facts which would be important to the buyer in making his decision.

*Id.* at 620, *quoting Delk,* 469 S.E.2d at 743. [Emphasis added].

The *Smith* case is particularly applicable to this case. The court in *Smith* found that the purchasers had been permitted to make whatever inspection of the property they desired and that they had in fact personally inspected the property. The purchasers, however, did not have a third person, such as an inspector, engineer, architect, or contractor, inspect the house. The court wrote: "The only measure taken by the plaintiffs to investigate any flooding problems was to ask defendants, but plaintiffs took no action to verify the answers received." *Id.* That is substantially what occurred here.

Finally, in *Hanlon v. Thornton,* 218 Ga. App. 500, 462 S.E.2d 154, 157 (1995), the purchaser sued the seller for fraud and concealment. The court held for the seller. *Id.* The court found that the purchaser should have followed up on an inspection and that all defects and problems were easily discoverable. The court ruled that the purchaser must show that defects could not have been discovered by due diligence. *Id.* The court wrote:

> When the means of knowledge are at hand and equally available to both parties to a contract of sale, if the purchaser does not avail himself of these means, he will not be heard to say, in impeachment of the contract, that he was deceived by the representations of the seller.

3. The plaintiff testified that she was afraid to ask again because she did not want to be

*Id.* at 156–57, *quoting Hill v. Century 21 Max Stancil Realty,* 187 Ga.App. 754, 371 S.E.2d 217, 219 (1988).

■ In the instant case, the plaintiff was apparently eager to purchase the home and move in as soon as possible. The home was 15 years old at the time of the sale. Yet the plaintiff did not hire a professional to inspect the home prior to closing, despite a contractual provision requiring that she do so. The plaintiff failed to perform any reasonable or meaningful inspection of the home prior to purchasing and closing on the home. In the circumstances, the plaintiff failed to exercise due diligence.

The court also finds the plaintiff's allegation that she was prevented from inspecting parts of the home unpersuasive. The plaintiff specifically claims that she was prohibited from inspecting the attic. The plaintiff testified, however, that she asked and was refused only one time.[3] The evidence is clear that the plaintiff had several other opportunities to inspect the attic, but she did not do so. For example, the plaintiff viewed the home on several later occasions. In addition, the plaintiff's father inspected the entire home, including the attic. Finally, the plaintiff inspected the home for about two hours on the day of closing, a time when the home was completely empty.

■ Further, to the extent there were defects—and serious ones—in the home, the plaintiff's own expert testified that they all were readily observable. Because any alleged latent defects were readily observable, the defendants had no legal duty to disclose them. *Smith,* 477 S.E.2d at 620; *Hanlon,* 462 S.E.2d at 157.

The plaintiff relies on *Blascak v. Sprague (In re Sprague),* 205 B.R. 851, 862 (Bankr.N.D.Ohio 1997). While the *Sprague* case has factual similarities to the

intrusive.

case at bar, there are several important factual distinctions.

In *Sprague*, the seller himself made significant improvements in the electrical and plumbing systems of the house without hiring professional help. The seller did not tell this to the buyer. The seller then advertised the house as having "new plumbing" and "new wiring." The buyer testified that he relied on verbal representations of the debtor in addition to a written disclosure statement. *Id.* at 854. The *Sprague* court found that the work on the house performed by the debtor himself was material and should have been disclosed to the buyer. The court found that the debtor's misrepresentations and omissions constituted materially false statements.[4] *Id.* at 861.

In this case, Mr. Bryant told Ms. Clark that he did much of the work himself to finish the basement. The defendants did not advertise the house as having "new" anything. The defendants did not make verbal statements to the plaintiff upon which she allegedly relied. Unlike *Sprague*, the problems of which the plaintiff complained were readily observable or discoverable according to her own expert's testimony.

The plaintiff must prove by a preponderance of the evidence that she justifiably relied on the misrepresentations in the Seller's Disclosure Statement and on the defendant's failure to disclose the defects. As part of proving the latter, the plaintiff must show that she exercised due diligence in inspecting the home before the purchase and that she could not have discovered the undisclosed defects herself. The plaintiff's proof on this element of justifiable reliance fails. Because this is a required element of proof, her entire claim fails.

### V.

For these reasons, the court concludes that the plaintiff has failed to meet her burden by a preponderance of the evidence that the alleged debt owed by the defendants to the plaintiff is nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code. Pursuant to the provisions of F.R.B.P. 9021, the court will enter a separate judgment in favor of the defendants, each party to bear their own costs and attorneys fees.

---

4. Although *Sprague* involved both affirmative oral misrepresentations and failures to disclose hidden defects, the *Sprague* court stated that silence may constitute a materially false representation. *Id.* Although that may be the law in that court's Circuit, it is not the law here because the court must look to Georgia law in construing Section 523(a)(2)(A) in the circumstances presented by this case. *See generally*, *St. Laurent*, 991 F.2d at 676.