In re Donna **PARKER**, Debtor.

Concetta **D'Angelo**, Plaintiff,

v.

Donna **Parker**, Defendant.

Bankruptcy No. 8:05–bk–7017–PMG.
Adversary No. 8:05–ap–515–PMG.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Sept. 8, 2006.

B. Gray Gibbs, Janette McCurley, Law Office of B. Gray Gibbs, St. Petersburg, FL, for Defendant.

George L. Hayes, III, Kathie Jo Malti, Carla L. Turner–Hahn, The Hayes Law Group, P.A., St. Petersburg, FL, for Plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Chief Judge.

**THIS CASE** came before the Court for a final evidentiary hearing in the above-captioned adversary proceeding.

The Plaintiff, Concetta D'Angelo, commenced this proceeding by filing a Complaint to Determine Creditor Concetta

D'Angelo's Claim as Exception to Discharge. In the Complaint, the Plaintiff alleges that her claim arises from her purchase of certain residential real property from the Debtor, Donna Parker. According to the Plaintiff, the Debtor fraudulently induced her to purchase the property. Consequently, the Plaintiff contends that her claim for damages is nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

In response, the Debtor contends that she did not knowingly make any false representations with respect to the property. The Debtor also contends that the Plaintiff could not justifiably have relied on any representation that the property consisted of a "three bedroom, two bath home," because the Plaintiff had complete access to the home for inspection purposes prior to closing. Consequently, the Debtor asserts that the Plaintiff cannot establish a cause of action under § 523(a)(2) of the Bankruptcy Code.

At the outset of the trial, the parties agreed to bifurcate the proceeding. (Transcript, pp. 6–7). Accordingly, the sole issue before the Court is the dischargeability of the claim asserted by the Plaintiff.

### Background

The Debtor is a licensed real estate broker/salesperson, and is also a certified residential real estate appraiser. (Transcript, pp. 176–77).

The Debtor and her husband previously owned a home located at 5654 Dartmouth Avenue North in St. Petersburg, Florida. The home initially had two bedrooms and one bathroom.

In 1997, the Debtor's husband enclosed the garage and added a bathroom to the home, in addition to adding a separate room in the back of the home and making various other improvements. (Transcript, pp. 186–87, 222). It appears that the Debtor's husband performed certain of the remodeling work himself, and hired contractors to perform certain other work. (Transcript, p. 228). The Debtor acknowledges that her husband did not obtain all of the required permits at the time that he made the improvements. (Transcript, pp. 188–89).

The Debtor moved into the home in October of 1997, after the remodeling work was complete. (Transcript, pp. 178, 221–22). While she resided in the home, the enclosed garage was used as a bedroom. (Transcript, p. 229).

The Debtor's husband died in November of 1998. (Transcript, p. 222).

Almost one year later, on September 7, 1999, the Debtor completed and signed a Residential Profile Sheet with respect to the home. (Plaintiffs Exhibit 2). The purpose of the Profile Sheet was to enable Coldwell Banker to list the property for sale. (Transcript, p. 183). The Profile Sheet describes the property as a three-bedroom, two-bath home.

On September 8, 1999, the home was included in an Agent Listing Synopsis, which essentially is the Multiple Listing Service advertisement for the sale of the home. (Plaintiffs Exhibit 1; Transcript, pp. 184–85). The Synopsis describes the property as a three-bedroom, two-bath house. The Debtor testified that the room described in the Synopsis as the Master Bedroom was the enclosed garage. (Transcript, pp. 185–86).

Shortly after the home appeared in the Multiple Listing Service, the Plaintiffs realtor, Dolores Wilson (Wilson), inquired about the listing and showed the home to the Plaintiff and the Plaintiffs daughter. (Transcript, pp. 55–56). The Plaintiff had contacted Wilson for assistance in finding

a home for her daughter. (Transcript, pp. 15, 51).

Wilson subsequently prepared a written offer for the Plaintiff to purchase the home from the Debtor for the sum of $77,000.00. (Plaintiffs Exhibit 3, Transcript, p. 56).

It appears that the Debtor counter-offered to sell the home for the sum of $78,000.00, and both parties initialed the undated Residential Sale and Purchase Contract. The Contract provided, among other terms, that the Plaintiff was permitted to obtain an inspection of the home by October 18, 1999, and that the closing was to occur on October 28, 1999. (Plaintiff's Exhibit 3).

Wilson met with the Debtor after the initial offer was presented, and the Debtor provided Wilson with her Seller's Property Disclosure Statement. (Plaintiffs Exhibit 5; Transcript, pp. 57–58). In the section of the Property Disclosure Statement regarding "Additions/Remodels," the Debtor wrote that it was "unknown" as to whether all necessary permits and approvals had been obtained, and that her "husband did some work himself." The Debtor also handwrote in the section on "Additions/Remodels" that "I have attached info on improvements and city records. All improvements do not show on city records." It appears that records regarding the air conditioner, roof repairs, and certain other improvements were attached to the Disclosure Statement. (Plaintiff's Exhibit 5).

The Plaintiff signed the Seller's Property Disclosure Statement on October 5, 1999.

After the Residential Sale and Purchase Contract was signed, the Plaintiff presented the Contract and the Seller's Disclosure Statement to her attorney, Deborah Valentino, for review. Based on her review of the documents, the attorney prepared an Addendum to the Contract for Sale. The Addendum originally stated:

> Seller shall pay for and obtain any and all required permits for improvements/additions made on the above property up to and including the date of the above contract for sale, including arranging for appropriate government inspector to inspect improvements/additions. Said permits shall be obtained no later than seven (7) days before closing date.

(Plaintiffs Exhibit 4). It appears that the Plaintiff signed the Addendum first, on October 6, 1999. After the Plaintiff had signed the document, the Debtor interlineated language in the Addendum to the effect that the inspection alternatively may be performed by an "architect or engineer as required by city building department." The Debtor then signed the Addendum and initialed the interlineation. The Plaintiff did not initial the language inserted by the Debtor. (Plaintiffs Exhibit 4; Transcript, pp. 21, 190).

On October 8, 1999, the Debtor attempted to "start the process" of obtaining after-the-fact permits for the work performed by her husband in 1997 by signing a Permit Application for the City of St. Petersburg. (Plaintiffs Exhibit 8; Transcript, p. 201). The Application was not completed on that date.

On October 18, 1999, as permitted by the Sale and Purchase Contract, the Plaintiff obtained an inspection of the home by Young Home Consulting, a state certified contractor. The Plaintiff was present at the time of the inspection and received a copy of the Inspection Report on that date. (Debtor's Exhibit 2). In the "structural overview" section of the Inspection Report, the inspector commented that "rear frame addition is amateur construction in nature-obtain all records of construction and permits."

The Plaintiff's Inspection Report refers to two bathrooms, but does not expressly state how many bedrooms are located in the home. In the section of the Report that addresses the structure, the inspector wrote that the garage was "enclosed for living space." In the section of the Report regarding closets, the inspector referred to a "middle" bedroom. Later in the Report, the inspector noted that the "rear bedroom's S/E window is faulty/difficult to open," and that "rear bedroom fan inoperable."

The Plaintiffs Report does not address any concern with the size or location of the windows in the addition, but does recommend review and possible minor repairs for the rear windows and the addition walls.

On October 20, 1999, two days after the Plaintiff obtained her home inspection report, Douglas Sattler (Sattler) wrote a letter to the Debtor regarding the enclosed garage and the addition of the separate room in the back of the home. (Plaintiffs Exhibit 8(b)). Sattler is an engineer who had been hired by the Debtor to assist her in obtaining after-the-fact permits for the improvements made by her husband. (Transcript, pp. 94–95). In the October 20 letter, Sattler summarized his findings regarding the enclosed garage as follows:

> With regard to the structure, the enclosing of the garage door, in the existing attached garage, did not have any structural effect since there was already a lintel over the garage door opening. The added CMU wall section is simply a non-bearing curtain wall and is acceptable. The remainder of the work is satisfactory. *Plumbing and HVAC work is not included in my examination.*
>
> *It is important to note that the garage/family room may not be used as a sleeping room unless and until proper egress is provided.*

(Plaintiffs Exhibit 8(b))(Emphasis supplied). Sattler testified that the building Code required that the sill height of egress windows in sleeping rooms "not exceed 44 inches ... so that a person can get out or a fireman can get in" in the event of an emergency. (Transcript, p. 100). Sattler further testified that the sill of the window in the enclosed garage was too high, so that the room did not qualify as a sleeping room under the Code. (Transcript, pp. 100–01). Finally, Sattler testified that he discussed the window's failure to meet the Code's requirements with the Debtor at the time that he visited the property. (Transcript, pp. 101–02).

On October 21, 1999, the day after Sattler wrote the letter to the Debtor, he executed an Affidavit in Support of Application for Construction Permit Based on Sections 104.3.2 and 104.6.2 of the 1997 Edition of the Standard Building Code. (Plaintiffs Exhibit 8(a)). In the Affidavit, which was supplied by the City as a form document, Sattler stated that the construction that was the subject of the Permit Application conformed to the City of St. Petersburg's Codes and "to the laws as to egress, type of construction and general arrangement." He also stated that the City may accept the Affidavit without inspection, provided that he submit certification that the structure, electrical, gas, mechanical, or plumbing systems "have been erected in accordance with the requirements of the technical codes." In the space below this preprinted language on the Affidavit form, Sattler handwrote "Construction is complete. After the fact permit." (Plaintiff's Exhibit 8(a)).

Sattler testified that he had reservations about signing the Affidavit, but knew that the City had his October 20 letter, and believed that the inspection results con-

tained in that letter would govern the application process. Sattler further testified that the Debtor told him that she would not be able to sell the house without the permit. (Transcript, pp. 111–12).

On October 25, 1999, the Debtor returned to the City and completed the Permit Application. Specifically, the Debtor completed the section of the Application encaptioned "description of work" by writing "enclose garage to family room," as well as listing the other improvements made by her husband. (Plaintiffs Exhibit 8; Transcript, pp. 201–02). It appears that the Debtor also submitted Sattler's Affidavit with the Application and paid the fees for the permits.

On the same day that the Debtor completed the Application, October 25, 1999, the City provided her with a receipt for the fees, a Permit Summary for a "minor alteration," a Permit Summary for a mechanical permit, and a City of St. Petersburg Permit. The mechanical Permit Summary includes "special notes and comments" that the permit involved is an "Affidavit Permit per attached letter from Sattler-enclose garage to family room." (Plaintiffs Exhibit 7; Transcript, p. 197).

The Debtor faxed the receipt, the Summaries, and the Permit to Wilson, the Plaintiffs realtor, on October 25, 1999, the same day that she received them. Wilson immediately faxed the documents to Deborah Valentino, the Plaintiffs attorney. (Transcript, pp. 63, 198, 206).

The sale of the property from the Debtor to the Plaintiff was scheduled to close three days later, on October 28, 1999. The Plaintiff, the Plaintiffs daughter, the Plaintiffs realtor, the Plaintiffs realtor's partner, the Plaintiff's attorney, and the title agents were present at the closing. The Debtor was not present, but was contacted by telephone throughout the closing. (Transcript, pp. 23, 65, 240–42).

Ultimately, the Plaintiffs realtor recommended that the Plaintiff conclude the transaction, and the sale closed. (Plaintiff's Exhibit 6).

The Plaintiffs daughter and grandson moved into the home after closing. (Transcript, p. 25).

On September 22, 2000, after the Plaintiffs daughter had requested certain information from the City, three City inspectors visited the property and performed separate electrical, mechanical, and plumbing inspections. It appears from a Land Activity Report that the work examined by the inspectors was disapproved. (Plaintiffs Exhibit 14(a); Transcript, pp. 156–59).

More than two years later, on November 7, 2002, the enclosed garage was inspected by Mel Hill, the City's supervisor for inspectors. (Transcript, p. 163). The results of Hill's inspection are contained in an Investigation Reply, also dated November 7, 2002.

> Rear bedroom has 2 windows. Neither meet F.B.C. sec 1005.4.4A. The one window I could not get to as bed was in the way. Window was about 60″ above floor. The other window was 49″ above the floor. Clear opening would be about 17″ W and 17½ H.

(Plaintiffs Exhibit 10). Upon reviewing this Report, Karen Freggens, an Applications Support Specialist for the City of St. Petersburg, testified that windows in the enclosed garage did not comply with the Code's requirements to qualify as a sleeping room. Freggens also testified that the noncompliance was not significant for purposes of the permit, because "we reissued the permit as a family room," and not a bedroom, as set forth in the Debtor's application. (Transcript, pp. 163–64). The construction performed to enclose the garage complied with the Code's requirements if the room were used for any pur-

pose other than a sleeping room. (Transcript, p. 129).

On July 13, 2001, the Plaintiff filed an action against the Debtor and Coldwell Banker in the Circuit Court for Pinellas County, Florida. In the state court action, the Plaintiff sought rescission of the sale, damages for fraud in the inducement, and damages for breach of contract.

On April 13, 2005, while the state court action remained pending, the Debtor filed a petition under Chapter 7 of the Bankruptcy Code.

The Plaintiff filed the Complaint that commenced this proceeding on June 22, 2005. In the Complaint, the Plaintiff alleges:

> Debtor obtained money in the form of payment for a piece of property through a representation that she was selling a properly permitted three bedroom two bathroom home, that was in a fact a two bedroom and possibly one bath home. At the time she made the representation she knew that the third bedroom could not be used legally for sleeping quarters.

(Doc. 1, p. 2). Consequently, the Plaintiff asserts that her claim against the Debtor is not dischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code, because the Debtor fraudulently induced her to purchase the home.

## Discussion

■ Section 523(a)(2)(A) of the Bankruptcy Code provides:

**11 U.S.C. § 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). According to the Eleventh Circuit Court of Appeals:

> Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud. A creditor must prove that: (1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.

*In re Bilzerian,* 153 F.3d 1278, 1281 (11th Cir.1998)(quoted in *In re Eisinger,* 304 B.R. 492, 497 (Bankr.M.D.Fla.2003)). "To establish the nondischargeability of a debt under § 523(a)(2)(A), a creditor must show that (1) the debtor made a false representation with the intent to deceive the creditor; (2) the creditor relied on the misrepresentation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the misrepresentation." *In re Forness,* 334 B.R. 724, 733 (Bankr. M.D.Fla.2005).

■ The burden is on the plaintiff to establish each of the elements required under § 523(a)(2)(A) by a preponderance of the evidence. If the creditor fails to establish any one of the elements by the requisite standard of proof, the debt will not be excepted from the debtor's discharge pursuant to § 523(a)(2)(A). *In re Bryant,* 241 B.R. 756, 765 (Bankr.M.D.Fla. 1999).

## A. The issue

In this case, there is no evidence that the Debtor intentionally misrepresented any facts regarding the Dartmouth Avenue property prior to October 20, 1999.

Specifically, the evidence indicates that the Debtor first learned that the enclosed garage did not qualify as a sleeping room under the City of St. Petersburg's Standard Building Code when Douglas Sattler visited the property on October 20, 1999. There is no direct evidence that the Debtor knew of the enclosure's noncompliance prior to that date.

The Debtor was not involved in the renovation, and did not live in the home at the time that the work was performed. After the remodeling was complete and the Debtor moved into the home, she and her husband used the enclosed garage as a bedroom.

The Debtor testified that she had no information at the time that she listed the house for sale in September of 1999 that the enclosed garage did not qualify as a sleeping room. (Transcript, p. 186). She testified that she believed that the house was a three-bedroom, two-bath house at the time that she listed it, (Transcript, p. 230), and her testimony in this regard is not contradicted. In fact, even the Plaintiff's realtor, Dolores Wilson, testified that there was no reason to believe that the Debtor knew that the house was not a "three-bedroom house" at the time that she listed it for sale and prepared the Property Disclosure Statement (Transcript, pp. 73, 76).

Although the Debtor did not know that the enclosed garage would not qualify as a sleeping room, she was aware that all required permits had not been issued for the improvements to the home, and she disclosed that fact to the Plaintiff.

The Debtor stated in her Seller's Property Disclosure Statement that it was "unknown" as to whether her husband had obtained all necessary permits and approvals for the work that he had performed, and that "all improvements do not show on City records." (Plaintiffs Exhibit 5). The Debtor affirmatively alerted the Plaintiff to the fact that the renovations to the house were not properly permitted. The Plaintiffs agent, Dolores Wilson, acknowledged that the issue regarding the permits came to her attention because the Debtor told her about it, that the Debtor told her that she did not think permits had been pulled for the work performed by her husband, and that the Debtor did not try to conceal the absence of the permits from her. (Transcript, p. 71).

Based on the evidence, therefore, the Court finds that the Debtor did not make any intentional misrepresentations regarding the property prior to October 20, 1999. The Debtor's initial listing of the property for sale as a three-bedroom, two-bathroom house was not an intentionally false statement, and she disclosed the lack of proper permits to the Plaintiff.

The Debtor testified, however, that she first learned of the "egress problem" with the enclosed garage when Douglas Sattler inspected the home on October 20, 1999. (Transcript, pp. 256–57). Sattler testified that the Debtor was present when he conducted his inspection, and that he discussed the lack of adequate egress with her at that time. (Transcript, pp. 101–02). Sattler prepared a letter to the Debtor dated October 20, 1999, in which he documented his finding regarding the failure of the enclosed garage to qualify as a sleeping room. (Plaintiffs Exhibit 8(b)).

For purposes of this dischargeability action, therefore, the issue is whether the Debtor made any false representations

with the intent to deceive the Plaintiff *after October 20, 1999.*

The Debtor's relevant conduct after October 20, 1999, falls into two general categories: (1) her completion of the Permit Application on October 25, 1999, including her presentation to the City of an Affidavit by Sattler; and (2) her delivery of a receipt for the Permit, two Permit Summaries, and a City of St. Petersburg Permit to the Plaintiff prior to closing.

The Court will evaluate each of these activities separately to determine whether they warrant a determination that the Plaintiffs claim should be nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

## B. The Permit Application

On October 25, 1999, the Debtor completed a Permit Application and submitted it to the City of St. Petersburg.

In the Application, she described the work for which she was seeking a permit as "enclose garage to family room." She had learned five days earlier, of course, that the enclosed garage could not be used as a sleeping room.

The Debtor also submitted the Affidavit of Douglas Sattler in support of her Permit Application. The form Affidavit signed by Sattler stated that the construction conformed "to the laws as to egress, type of construction and general arrangement." The form Affidavit also stated that he agreed to provide certification that the electrical, gas, mechanical, or plumbing systems were erected in accordance with the Building Code's requirements. Sattler hand printed below this statement that the "construction is complete," and that the Affidavit related to an "after the fact permit."

Five days earlier, of course, Sattler had informed the Debtor that the enclosed ga-

rage did not comply with the Building Code's egress requirements for bedrooms, and that he did not inspect the home's plumbing and HVAC work.

■ The Court finds that the Permit Application completed by the Debtor does not constitute a "false representation with the intent to deceive" the Plaintiff for purposes of § 523(a)(2)(A) of the Bankruptcy Code.

First, the Debtor's statement on the Application that she was seeking a permit to enclose a garage for a family room was not inherently false. The garage had been enclosed, the structure could properly be used as a family room (Transcript, p. 129), and the Debtor was not prohibited from seeking approval of the work for whatever use she chose. Consequently, it does not constitute a false statement.

Second, the Plaintiff did not establish that the Debtor used Sattler's Affidavit "with the intent to deceive" the Plaintiff.

The Debtor testified that she submitted Sattler's original letter dated October 20, 1999, to the City as soon as she received it on October 21, 1999, and that the City employee kept the letter for the file. (Transcript, pp. 204–05). According to the Debtor, the City employee informed her at that time that the letter was not in an acceptable format, and that Sattler must sign the affidavit in the form that the employee provided to her. Consequently, when the Debtor returned on October 25 with the Affidavit signed by Sattler, she knew that the City already had his letter stating that the garage "may not be used as a sleeping room unless and until proper egress is provided." (Transcript, p. 205).

The Debtor's testimony in this regard is corroborated by that of Karen Freggens, who was the Construction Permit Supervisor for the City of St. Petersburg in 1999, and who is currently an Application Sup-

port Specialist for the City. (Transcript, p. 142). Freggens testified that Sattler's October 20, 1999, letter was "a part of the permit file" and available for review by the public prior to the closing of the sale on October 28, 1999. (Transcript, pp. 164–165).

Since the Debtor had furnished Sattler's original letter to the City prior to completing the Permit Application, and since the City retained the letter as part of its file, the Court cannot conclude that the Debtor had the requisite "intent to deceive" when she later submitted his Affidavit in connection with the application process. Given the Debtor's voluntary submission of the letter to the City, the Debtor's subsequent use of Sattler's Affidavit was neither knowingly false, nor so reckless as to warrant a finding that she acted fraudulently. *Agribank, FCB v. Gordon*, 2002 WL 32155708, at \*4 (M.D.Ga., Sept. 18, 2002).

The Permit Application submitted by the Debtor to the City on October 25, 1999, does not constitute a "false representation with intent to deceive" within the meaning of § 523(a)(2)(A) of the Bankruptcy Code.

### C. The delivery of the Permit documents

■ The Debtor testified that she obtained the receipt for the Permit fee, two Permit Summaries, and the final Permit from the City on October 25, 1999. (Transcript, p. 197). She further testified that she faxed the documents to Dolores Wilson, the Plaintiff's broker, on the same day that she received them, and that Wilson immediately faxed the documents to the Plaintiffs attorney, Deborah Valentino. (Transcript, pp. 198, 206). The Debtor contends, therefore, that the Plaintiff or her agents had all of the necessary documents to learn the status of the Permit three days before the scheduled closing.

The Plaintiff asserts, however, that the delivery of the documents amounted to the fraudulent omission of a material fact, because the Debtor did not send them Sattler's letter of October 20, 1999, or a copy of the Permit Application which stated that the garage was enclosed for a "family room." The Plaintiff further contends that the Debtor did not otherwise notify' them that the enclosed garage could not be used as a sleeping room.

Clearly, the Debtor did not provide the Plaintiff or her agents with a copy of Sattler's letter or the Permit Application. (Transcript, pp. 204–05).

The Court finds, however, that the Debtor's transmission of the Permit documents to the Plaintiff without Sattler's letter or the Application does not constitute a false representation "with the intent to deceive" within the meaning of § 523(a)(2)(A) of the Bankruptcy Code.

First, the evidence is in conflict as to whether the Debtor personally informed the Plaintiff's realtor that the garage would not qualify as a sleeping room.

The Debtor testified, for example, that Dolores Wilson called her to learn the results of Sattler's inspection on or about October 20, and that she told Wilson that Sattler thought the window was approximately one inch too high for the enclosed garage "to technically be permitted as a bedroom." (Transcript, pp. 203–04). Later in the hearing, the Debtor testified that:

> I told Dolores Wilson the day that the guy did the inspection that there is a problem with that window that he said it was about an inch too high for egress for being used as a bedroom. Dolores Wilson told me, "They're going to put all new windows in the house right after the closing anyway and that wasn't really a

problem." She was sure that wasn't a problem.

(Transcript, pp. 219–20, 234).

In contrast, Dolores Wilson testified that the Debtor never told her prior to closing that the enclosed garage could not be used as a sleeping room. (Transcript, pp. 67, 290–91). According to Wilson, she did not learn that the enclosed garage could not be used as a sleeping room until approximately one year after the sale had closed. (Transcript, p. 74).

This conflict in the testimony was not resolved at trial. Consistent with the testimony of the Debtor, however, the Plaintiff did in fact replace the windows in the home after closing. (Transcript, p. 48).

Even if the Debtor did not personally inform the Plaintiff that the garage could not be used as a sleeping room, however, the Plaintiff did not satisfy the burden of proving that the Debtor intended to deceive her by transmitting only the receipt for the Permit fee, the Permit Summaries, and the City Permit.

The Plaintiff and the Debtor never met, and never spoke to each other, before the closing of the sale on October 28, 1999. (Transcript, pp. 41, 203). Accordingly, it is clear that the Plaintiff never personally communicated to the Debtor that she was only interested in purchasing a three-bedroom house, and that a house with fewer bedrooms would not be acceptable.

Further, there is absolutely no evidence in the record that any of the Plaintiffs agents ever advised the Debtor that the home must have three bedrooms as a prerequisite to the sale. It is unlikely that the Plaintiff's realtor, Dolores Wilson, communicated the requirement to the Debtor, for example, since Wilson knew that the Plaintiff's daughter previously had made offers to purchase homes with only one or two bedrooms. (Transcript, pp. 77–79). Consequently, the record does not establish that the Debtor understood the significance of characterizing the garage as a family room at the time that she faxed the Permit documents to the Plaintiffs realtor.

The Court cannot conclude that the Debtor knew that the Plaintiff would not close the sale if the property were described as a two-bedroom home. As far as the record establishes, the Debtor had no reason to conceal the fact that the enclosed garage was characterized as a family room when she faxed the Permit documents to the Plaintiff's realtor.

In fact, the mechanical Permit Summary that the Debtor provided to the Plaintiffs realtor prior to closing included "special notes and comments" that the Permit involved was an "Affidavit Permit per attached letter from Sattler—enclose garage to family room." (Plaintiff's Exhibit 7; Transcript, p. 197).

Finally, the Plaintiff was well-represented by a realtor and an attorney throughout the transaction. The realtor had prepared the original Residential Sale and Purchase Contract. The attorney had reviewed the original Contract and the Seller's Property Disclosure Statement. Based on that review, the attorney prepared the Addendum that provided for the Debtor to obtain the permits. The realtor had viewed the property and reviewed the Inspection Report prepared at the request of the Plaintiff. (Transcript, p. 80).

In other words, from the earliest stages of the negotiations, the Debtor knew that the Plaintiff was represented by a team of professionals who were scrutinizing every aspect of the transaction. It is reasonable to conclude that she anticipated the same level of scrutiny with respect to the Permit documents that she delivered to the Plaintiffs realtor three days prior to the closing.

As set forth above, the burden is on the creditor to establish each of the elements required under § 523(a)(2)(A) by a preponderance of the evidence. *In re Bryant*, 241 B.R. at 765. In this case, the Plaintiff has not satisfied the burden of proving that the Debtor intended to deceive her by transmitting the Permit documents on October 25, 1999. The Plaintiffs claim should not be excepted from the Debtor's discharge under § 523(a)(2)(A) of the Bankruptcy Code.

### Conclusion

The issue in this case is whether the Debtor fraudulently induced the Plaintiff to purchase a home located in St. Petersburg, Florida. The Court finds that the Debtor did not make any false representations regarding the home with the intent to deceive the Plaintiff. Consequently, the Plaintiffs claim should not be excepted from the Debtor's discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

Accordingly:

**IT IS ORDERED** that:

1. The claim asserted by the Plaintiff, Concetta D'Angelo, is not excepted from the discharge of the Debtor, Donna Parker, pursuant to § 523(a)(2)(A) of the Bankruptcy Code.

2. A separate Final Judgment will be entered in favor of the Debtor, Donna Parker, and against the Plaintiff, Concetta D'Angelo.